# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIFFANY MITCHELL, et al.,<br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br>Defendants. | CV 20-8709 DSF (GJSx)<br><br>Order GRANTING Plaintiffs' *Ex Parte* Application to Lift Stay and DENYING *Ex Parte* Application for Temporary Restraining Order (Dkt. 24) |

Plaintiffs Tiffany Mitchell, Tom Moser, and Glenn West filed an *ex parte* application for entry of a temporary restraining order (TRO) enjoining Defendants Gavin Newsom, Mark Ghaly, and Erica Pan from enforcing the State of California's Regional Stay at Home Order against tattoo businesses. Dkt. 24-1 (Mot.). Defendants oppose. Dkt. 27 (Opp'n). For the reasons stated below, the *ex parte* application is DENIED.[1]

## I. BACKGROUND

### A. The COVID-19 Outbreak and the State's Response

COVID-19 is a novel coronavirus disease not seen in humans until late 2019. Dkt. 27-2 (Watt Decl.) ¶ 16. Beginning in March 2020, the State of California began issuing orders, directives, and guidance in order to reduce community spread of the virus and, therefore, decrease death and disability. Id. ¶¶ 44-45, 48. On March 19, 2020, Governor Gavin Newsom issued the first executive order directing California residents to stay at home except as needed to maintain essential

---

[1] The unopposed request to lift the stay is granted.

critical infrastructure.  Id. ¶ 48.  Since this first order, the state has cycled through closing and reopening phases depending in part on the rates of infection and capacity of medical facilities, etc.  See id. ¶¶ 49-61.

On August 31, 2020, the State released a new plan for reopening, the "Blueprint for a Safer Economy."  Id. ¶ 56.  The Blueprint creates four tiers that group counties depending on case numbers, positivity rate, and equity metrics for disproportionately impacted populations.  Id. ¶ 57.  Each tier provides progressively more relaxed restrictions on various activities.  Id. ¶ 58.  Initially, tattoo parlors were not permitted to open indoors until a county was in the second tier.  Id. ¶ 60.  On October 20, 2020, however, the Blueprint was updated to permit all personal care services,[2] including tattoo services, to operate indoors, with modifications, in all tiers.  Id.

Beginning in mid-November 2020, California "experienced an alarming surge in new COVID-19 cases," with new cases per day increasing by more than 112% and hospital admissions doubling.  Id ¶ 62.  In response, on December 3, 2020, the State issued a Regional Stay at Home Order (Regional Stay at Home Order or Order).  Id. ¶ 63.  The Order established five geographic regions to be evaluated based on adult Intensive Care Unit (ICU) bed capacity.  Id. ¶ 64.  One of the regions is Southern California, which includes Los Angeles and Ventura counties.  Id.  The Regional Stay at Home Order is triggered if ICU capacity drops below 15% in a region.  Id. ¶ 65.  Once triggered, the Order applies to the region for at least three weeks.  Id.  Once the Order goes into effect, all indoor recreational facilities; hair salons and barbershops; personal care services; museums, zoos, and aquariums; movie theaters other than drive-ins; wineries; bars, breweries, and distilleries; family entertainment centers; cardrooms and satellite

---

[2] "Personal care services" include esthetic, skin care, electrology, nail services, body art professionals, tattoo parlors, piercing shops, and massage therapy.  COVID-19 Industry Guidance: Expanded Personal Care Services at 3 (Oct. 20, 2020), https://files.covid19.ca.gov/pdf/guidance-expanded-personal-care-services--en.pdf.

wagering; limited services; live audience sports; and amusement parks in the affected region must close. Id. ¶ 67. The only businesses allowed to remain open are those qualifying as essential critical infrastructure and retail. Id. ¶ 68. Retail (other than grocery stores) may operate at 20% capacity. Id. ¶ 69.

Dr. James Watt, the Chief of the Division of Communicable Disease Control of the Center for Infectious Diseases at the California Department of Public Health, id. ¶ 2, explained the differing treatment of retail and personal care services:

> [T]hese personal care services typically involve activities that entail very close contact between people and often require an hour to several hours' length in duration. The factors that increase risk of transmission of COVID-19 are the following: close proximity, duration of time, larger number of people, poor ventilation, activities that increase respiration and smaller airspace. Looking at all of these, tattoo services have close proximity, longer duration, and smaller airspace compared to retail. Tattoo services, and other personal care services, in comparison to retail businesses, present a greater risk of COVID-19 transmission due to the activities involving close physical proximity of longer duration in smaller airspace. For example, although there may be larger volume of individuals frequenting retail establishments, the opportunities for transmission are balanced by shorter interactions between individuals, and in spaces where physical distancing can be maintained and where capacity limits exist to mitigate the risk of transmission.

Id. ¶ 76.

On December 5, 2020, the State announced that the Southern California region had dropped below 15% ICU capacity, triggering the application of the Regional Stay at Home Order. Opp'n at 7. The

Order went into effect at 11:59 p.m. on December 6, 2020 and remains in effect until at least December 27, 2020.  Id.

B.     **Plaintiffs' Tattoo Businesses**

Plaintiffs are tattoo artists who own tattoo shops.  Dkts. 24-2 (Mitchell Decl.) ¶¶ 2-4, 24-3 (Moser Decl.) ¶¶ 2-3, 24-4 (West Decl.) ¶¶ 2-3.  Mitchell and Moser's tattoo shops are in Los Angeles County.  Mitchell Decl. ¶ 4; Moser Decl. ¶ 3.  West's tattoo shop is in Ventura County.  West Decl. ¶ 3.  Plaintiffs' tattoo shops were allowed to open from approximately October 20, 2020 to December 6, 2020.  Mitchell Decl. ¶ 14, Moser Decl ¶ 9, West Decl. ¶ 8.  During that time, all three plaintiffs implemented new health and safety measures.  Mitchell Decl. ¶ 6, Moser Decl. ¶ 6, West Decl. ¶¶ 6-7.  For instance, Mitchell began seeing clients by appointment only, handled all pre-tattoo consultations virtually, had clients wait outside when they arrived for their appointments, reduced surfaces within the shop touched by multiple people, required masks for all who enter the shop, prohibited food and drink in the shop, took the temperature of anyone who entered the shop, purchased PPE for all employees, and reconfigured the shop to enforce social distancing.  Mitchell Decl. ¶¶ 6-13.

## II. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  The standard for granting a temporary restraining order is essentially the same as that used for granting a preliminary injunction.  See City of Tenakee Springs v. Block, 778 F.2d 1402, 1407 (9th Cir. 1985).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter, 555 U.S. 7 at 20.  Although the moving party must make a showing on each factor, the Ninth Circuit employs a "version of the sliding scale approach" where "a stronger showing of one element

4

may offset a weaker showing of another." All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011).

### III. DISCUSSION

Plaintiffs argue that by requiring tattoo shops to close, the Regional Stay at Home Order violates their First Amendment rights under the Free Speech Clause. Defendants argue the First Amendment does not apply because the Order does not concern speech and, even if it does, the Order survives intermediate scrutiny.

### A. Likelihood of Success on the Merits

The Ninth Circuit considers the likelihood of success on the merits "the most important Winter factor; if a movant fails to meet this threshold inquiry, the court need not consider the other factors." Disney Enters., Inc. v. VidAngel, Inc., 869 F.3d 848, 856 (9th Cir. 2017) (internal quotation marks omitted). However, even if likelihood of success is not established, "[a] preliminary injunction may also be appropriate if a movant raises 'serious questions going to the merits' and the 'balance of hardships . . . tips sharply towards' it, as long as the second and third Winter factors are satisfied." Id. (second alteration in original) (quoting All. for the Wild Rockies, 632 F.3d at 1134-35).

The First Amendment provides: "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I. "The First Amendment, applied to states through the Fourteenth Amendment, prohibits laws abridging the freedom of speech." Animal Legal Def. Fund. v. Wasden, 878 F.3d 1184, 1193 (9th Cir. 2018) (internal quotation marks omitted). In effect, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." United States v. Stevens, 559 U.S 460, 468 (2010) (quoting Ashcroft v. ACLU, 535 U.S. 564, 573 (2002)).

Courts apply three levels of scrutiny to laws that affect First Amendment rights – rational basis, intermediate scrutiny, and strict scrutiny. Retail Digit. Network, LLC v. Prieto, 861 F.3d 839, 847 (9th

Cir. 2017). Courts apply rational basis review to "non-speech regulations of commerce and non-expressive conduct." Id. Regulations of First Amendment-protected speech are subject to strict or intermediate scrutiny depending on whether the regulation is content-based or content-neutral. A regulation that restricts protected expression based on the content of the speech is constitutional only if it withstands strict scrutiny, see United States v. Playboy Ent. Grp., Inc., 529 U.S. 803, 813 (2000), meaning that it "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end," Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983). A content-neutral regulation is constitutional if it is "justified without reference to the content of the regulated speech, . . . [is] narrowly tailored to serve a significant governmental interest, and . . . leave[s] open ample alternative channels for communication of the information." Ward v. Rock Against Racism, 491 U.S. 781, 791 (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984)).

Defendants first argue the Regional Stay at Home Order should be subject to rational basis review because it "does not concern speech" but rather "is a generally applicable health order requiring that most business sectors, including all personal care services, temporarily cease operations to reduce the opportunity for interactions between persons of different households and to stem the rampant spread of the virus." Opp'n at 10. "[I]n the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." Thalheimer v. City of San Diego, 645 F.3d 1109, 1116 (9th Cir. 2011), overruled on other grounds by Bd. of Tr. of Glazing Health & Welfare Tr. v. Chambers, 941 F.3d 1195 (9th Cir. 2019) (en banc). The Ninth Circuit has held that a "tattoo *itself*, the *process* of tattooing, and even the *business* of tattooing are . . . purely expressive activity fully protected by the First Amendment." Anderson v. City of Hermosa Beach, 621 F.3d 1051, 1060 (9th Cir. 2010). Plaintiffs therefore argue "the forced closing of tattoo business must

6

survive stricter scrutiny than a regulation of non-protected businesses." Mot. at 6.

While the Regional Stay at Home Order does force tattoo businesses to close, and the process and business of tattooing is protected conduct, it does not necessarily follow that the Regional Stay at Home Order is a regulation of First Amendment-protected speech. While the Supreme Court "has applied First Amendment scrutiny to a statute regulating conduct which has the incidental effect of burdening" expression, it has "not traditionally subjected every criminal and civil sanction imposed through legal process to 'least restrictive means' scrutiny simply because" it "will have some effect on the First Amendment activities of those subject to sanction." Arcara v. Cloud Books, Inc., 478 U.S. 697, 702, 706 (1986). In Arcara, the Supreme Court identified two different types of restrictions properly subjected to First Amendment scrutiny: (1) restrictions "where it was conduct with a significant expressive element that drew the legal remedy in the first place" and (2) restrictions "where a statute based on nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity." Id. at 706-07.

The Regional Stay at Home Order clearly does not fit within the first of the two categories. The Order was not imposed to prevent the expressive element of tattooing but rather to prevent the spread of COVID-19. Whether it falls within the second category turns on whether the distinctions drawn in the Order "inevitably single out" those "engaged in First Amendment protected activities for the imposition of its burden." Id. at 705. In Arcara, a civil complaint was filed against an adult bookstore because sexual activities such as prostitution were occurring on the premises in violation of New York's public health law. Id. at 699. The bookstore argued "a closure of the premises would impermissibly interfere with [its] First Amendment right to sell books on the premises." Id. at 700. The Court held "the First Amendment [wa]s not implicated by the enforcement of a public health regulation of general application against the physical premises in which respondents happen to sell books." Id. at 707.

In contrast, in Minneapolis Star and Tribune Co. v. Minnesota Commissioner of Revenue, 460 U.S. 575, 592 (1983), the Supreme Court struck down a tax imposed on the sale of large quantities of newsprint and ink because the tax had the effect of singling out newspapers to shoulder its burden.  As the Court explained in Arcara, in Minneapolis Star it "imposed a greater burden of justification on the State even though the tax was imposed upon a nonexpressive activity, since the burden of the tax inevitably fell disproportionately – in fact, almost *exclusively* – upon the shoulders of newspapers exercising the constitutionally protected freedom of the press."  478 U.S. at 704 (emphasis added).

The Court finds the Regional Stay at Home Order does not single out those engaged in expressive activity.  Singling out by definition would require tattoo parlors to be treated uniquely from all other types of businesses or to bear disproportionately the burden of the restriction.  That is not the case here.  All personal care services are treated the same by the order, as are numerous other businesses including recreational facilities, hair salons, bars, and amusement parks.  None of these other types of businesses are engaged in protected expressive activity.

This differentiates this case from Roman Catholic Diocese of Brooklyn v. Cuomo, No. 20A87, 2020 WL 6948354 (U.S. Nov. 25, 2020), on which Plaintiffs rely heavily.  In Roman Catholic Diocese, the Supreme Court found a state executive order imposing occupancy restrictions on houses of worship during the COVID-19 pandemic violated the Free Exercise Clause.  Id. at *1.  There, not only could the challenged rule "be viewed as targeting the ultra-Orthodox [Jewish] community," but also "the regulations [could not] be viewed as neutral because they single[d] out houses of worship for especially harsh treatment."  Id. (first alteration in original) (internal quotation marks omitted).  Here, tattoo parlors are not singled out for differential treatment among like businesses, such as hair and nail salons, in which close contact between individuals is necessitated by the nature of the business.

8

Having determined that rational basis review applies, the Court considers whether the Regional Stay at Home Order is "rationally-related to a legitimate governmental interest." Ball v. Massanari, 254 F.3d 817, 823 (9th Cir. 2001). The State's interest in stemming the spread of COVID-19 in a region with limited ICU capacity is a substantial government interest. The regulation easily passes the "legitimate interest" test.

Even if the Court were to determine that the regulation singled out tattoo parlors, its ruling would not change. In that case, the Court would apply intermediate rather than strict scrutiny because the Order is content neutral under Anderson. 621 F.3d at 1059 n.4 (noting it would be inappropriate to subject a city ban on tattoo parlors to strict scrutiny because "the City bans all tattoo parlors, not just those that convey a particular kind of message or subject matter"). Here, the ban is not limited to certain tattoo parlors – in fact, it is not limited to tattoo parlors at all but rather extends equally to all personal care services. It is therefore a content-neutral restriction.

In evaluating a regulation under intermediate scrutiny, a court determines "whether the . . . regulation is a reasonable 'time, place, or manner' restriction on protected speech." Id. at 1064 (quoting Ward, 491 U.S. at 791). "This determination requires an inquiry into whether the restriction: (1) is 'justified without reference to the content of the regulated speech'; (2) is 'narrowly tailored to serve a significant governmental interest'; and (3) 'leave[s] open ample alternative channels for communication of the information.'" Id. (alteration in original) (quoting Clark, 468 U.S. at 293).

A content-neutral regulation may be narrowly tailored "even though it is not the least restrictive or least intrusive means of serving the statutory goal." Hill v. Colorado, 530 U.S. 703, 726 (2000). This requirement is satisfied if the regulation "promotes a substantial government interest that would be achieved less effectively absent the regulation." Ward, 491 U.S. at 798-99. Defendants have satisfied that requirement. In closing tattoo and other personal care businesses, Defendants are promoting the significant governmental interest of

9

protecting public health by keeping closed areas that present heightened risks for COVID-19 transmission.[3] Additionally, the Regional Stay at Home Order is narrowly tailored because it goes into effect only once there is 15% remaining ICU capacity and is lifted in three weeks or once ICU availability again reaches a 15% threshold. Watt Decl. ¶ 70. As soon as the Order is lifted, Plaintiffs will be able to operate their businesses again. The Order is thus justified without reference to the content of the regulated speech and promotes a substantial government interest that would be achieved less effectively absent the regulation.

Finally, the Regional Stay at Home Order leaves open ample alternative channels for communication. As Defendants state, "during the pendency of the temporary order, Plaintiffs are free to continue conducting pre-tattoo creative consultations virtually, and plan work to be done when the parlors reopen." Opp'n at 16; see Givens v. Newsom, 459 F. Supp. 3d 1302, 1314 (E.D. Cal. 2020) (plaintiffs who were foreclosed from gathering in large groups in-person by COVID-19-related restrictions had ample alternative channels of communication because they were "free to use online and other electronic media to stage their rallies and make their protests").

---

[3] Plaintiffs argue there is not a substantial public health interest behind the Order because, to their "knowledge, there is no documented case of Covid-19 transmission between a tattoo artist and a client." Mot. at 8. Without evidence of the depth of Plaintiffs' "knowledge" or the extent to which transmissions have been accurately traced, such an argument is meaningless. The Court notes that when elected officials "undertake[ ] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." Marshall v. United States, 414 U.S. 417, 427 (1974). "Where those broad limits are not exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." S. Bay United Pentecostal Church v. Newsom, 140 S. Ct. 1613 (2020) (mem.) (Roberts, J., concurring) (citing Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 545 (1985)).

Additionally, Plaintiffs can create temporary tattoos clients can apply themselves until they are able to reopen or other types of artwork. While it is true that a tattoo "often carries a message quite *distinct* from other media," here the state has not "completely foreclosed a venerable means of communication that is both unique and important," as the City of Hermosa Beach did by implementing a permanent tattoo parlor ban in Anderson. 621 F.3d at 1066-67 (internal quotation marks omitted); cf. Hudder v. City of Plant City, No. 8:14-cv-01686-EAK-EAJ, 2015 WL 12839179, at *4 (M.D. Fla. Nov. 20, 2015) (ordinance prohibiting tattoo establishments within the city's downtown core but permitting them within other commercially-zoned areas of the city left open "sufficient alternative channels for the expression of the protected art of tattooing").

## B. Remaining Factors

A district court may not grant a plaintiff's motion for a temporary restraining order if the request fails to show the plaintiff is likely to succeed on the merits of a claim or, at least, raises serious questions going to the merits of that claim. See Winter, 555 U.S. at 20; All. for the Wild Rockies, 632 F.3d at 1135. Plaintiffs here failed to demonstrate a likelihood of success. The Court need not consider the remaining factors in denying their request.

## IV. CONCLUSION

For the reasons set forth above, the Court DENIES Plaintiffs' Ex Parte Application for a Temporary Restraining Order.

IT IS SO ORDERED.

Date: December 23, 2020

*Dale S. Fischer*

Dale S. Fischer
United States District Judge